IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BLAS ALEMAN.

CRIMINAL ACTION NO.

1:08-CR-223-2-WSD-CMS

## REPORT AND RECOMMENDATION

This case is before the Court on the Motion to Dismiss Due to Post-Indictment, Pre-Arrest Delay, filed by Defendant Blas Aleman ("Defendant" or "Aleman").  (Doc. 214).  Aleman asserts that the indictment should be dismissed based on an eight-year delay between the time that he was indicted and the time that he was arrested.  (Doc. 214).    For the reasons stated below, I conclude that the Government did not deprive Aleman of his constitutional right to a speedy trial, and therefore recommend that his motion be denied.

### I.    FACTS

#### A. Procedural History

On June 10, 2008, a federal grand jury in the Northern District of Georgia returned an indictment charging Aleman and others with being part of a conspiracy to possess cocaine and methamphetamine with the intent to distribute, between March and May of 2008. (Doc. 10). The arrest warrant for Aleman, however, was

not executed until nearly eight years later, in March 2016, after Aleman was extradited from Mexico. (Doc. 209).  On April 20, 2016, Aleman filed the pending motion to dismiss alleging a violation of his constitutional right to a speedy trial, and he later supplemented the motion.[1] (Docs. 214, 244).  The Government filed a response, stating, among other things, that the Court should hold an evidentiary hearing on the motion to dismiss.  (Doc. 256 at 3-7, 9).  On October 12, 2016, I conducted a day-long evidentiary hearing at which the Government presented six witnesses, and a transcript has been prepared.  (Doc. 267, Transcript ["Tr."]).  Aleman and the Government filed post-hearing briefs. (Docs. 269, 278, 279).  The matter is now fully briefed and ready for ruling.

### B. Facts Relevant to the Speedy Trial Motion to Dismiss

In May 2005, three years before the beginning of the conspiracy alleged in this case, Aleman was arrested in Florida for methamphetamine trafficking. (Tr. at 16-17, 24-25; Gov't Ex. 2).  Following the arrest, Victoria Aviles, Aleman's wife at the time and the mother of his children, bailed Aleman out of jail with $15,000 cash that she got from one of Aleman's relatives.  (Tr. at 53-54; Gov't Ex. 3).  According to Ms. Aviles, the day after she bailed Aleman out of jail, he stopped by

---

[1] In his first two filings, Aleman also made passing reference to a claim for a statutory speedy trial violation, but he has presented no argument in support of such a claim.  (Doc. 214 at 1; Doc. 244 at 1).

their home for two hours, and then he left, not to be heard from again by her or her children for more than eight years. (Tr. at 54-56).  According to Detective Clay Nicholson of the Hardee County, Florida Sheriff's Office, who was involved in Aleman's Florida case, Aleman failed to appear at his Florida state court arraignment on the methamphetamine trafficking charge, and the Florida court issued a failure-to-appear warrant for Aleman's arrest in June 2005.  (Tr. at 27; Gov't Ex. 3, 4).

Detective Nicholson testified that he searched unsuccessfully for Aleman in response to the failure-to-appear warrant until March 2008 when he learned from a confidential source that Aleman was in Atlanta, reportedly in the drug business with his uncle, Juan Aleman.[2]  (Tr. at 42-43, 45).  Detective Nicholson put his confidential source in touch with the Atlanta office of the Drug Enforcement

---

[2] Defendant Blas Aleman disputes that he was in Atlanta in 2008.  He also disputes that Juan Aleman is his uncle: "Blas Aleman simply does not know the man.  He is not a brother to defendant's father or mother."  (Doc. 244 at 11). Immigration documents supplied by Aleman, however, reflect that Aleman's grandparents have the same names as Juan Aleman's parents. (Compare Def. Ex. 2 at 1 [DEA report describing contents of Juan Aleman's INS files listing Juan Aleman's place of birth as "El Salitre, Guerrero, Mexico," and listing his parents' names as Thomasa Mederos and Juan Aleman] with Def. Ex. 7 at 43 [Defendant's translated birth certificate stating place of birth as "Salitre, Guerrero" and listing grandparents' names as Tomasa Mederos and Juan Aleman]).  Aleman's parents have denied, under oath, that they know "anyone named Juan Aleman."  (Doc. 243-1 at 2; Doc. 243-2 at 2).

3

Agency ("DEA"). (Id. at 43-44).  DEA Special Agent Michael Bagley testified that he took part in the DEA's investigation into Aleman's suspected drug activities. He stated that he received the tip from Detective Nicholson's confidential source and began investigating Aleman.  (Id. at 75, 99).  Special Agent Bagley testified that in early March 2008, he was part of a surveillance team that photographed Aleman and his uncle, Juan Aleman, at a car dealership and at a hotel in the Atlanta area.  (Id. at 96-98, 134).  At the hearing, the Government introduced photographs that purportedly showed Aleman in Atlanta in 2008.  (Gov't Exs. 6, 7).

On June 10, 2008, Aleman was indicted in this case along with four others, including Juan Aleman and Filiberto Alanis-Soto, a man who reportedly grew up with Aleman in Guerrero, Mexico. (Id. at 119).[3]  (Doc. 10).  After the indictment was handed down, Special Agent Bagley and other agents spent a few days trying to locate Aleman, but these efforts were unsuccessful.  Later that month, the DEA turned the Aleman fugitive investigation over to the United States Marshals

---

[3] In his brief, Aleman acknowledges that he and Alanis-Soto are from the same small town in Mexico. (Doc. 269 at 8, 15; Tr. at 42, 119).  Aleman's parents, however, have sworn that they do not know Alanis-Soto.  (Doc. 243-1 at 2; Doc. 243-2 at 2).

Service ("USMS"), which is standard DEA procedure. (Id. at 83).  At that point, the fugitive investigation became the USMS's responsibility. (Id.).

Special Agent Bagley testified that although the investigation was now in the hands of the USMS, the DEA nonetheless compiled an annual fugitive report of its efforts to locate and arrest Aleman.  (Tr. at 83).  Every year from 2008 until 2014, DEA agents reviewed information in the Narcotics and Dangerous Drugs Information System, confirmed that Aleman's arrest warrant remained active with the National Crime Information Center ("NCIC"), and checked the El Paso Intelligence Center database to ensure the information about Aleman was correct. (Id. at 83-88).  According to Special Agent Bagley, the purpose of checking these databases was to ensure that the arrest warrant in this case was active so that if another law enforcement agency encountered Aleman, the DEA would be notified, and to make sure that all the information about Aleman and the fugitive investigation was current and correct. (Id. at 84-87).

USMS Criminal Inspector Alberto Navarro led the USMS fugitive investigation of Aleman. (Tr. at 149-50).  Upon receiving the case in June 2008, Inspector Navarro performed general internet research and credit searches, using Aleman's social security number provided by the DEA, which revealed a possible address for Aleman in Smyrna, Georgia at an apartment complex. (Id. at 151-52,

5

156). Inspector Navarro went to the Smyrna address, where he first conducted surveillance and then spoke with the apartment complex's employees and neighbors, but he did not get any helpful information. (<u>Id.</u> at 156-58, 219). He then knocked on the door of the apartment, where he spoke to a man who identified himself as Aleman's brother. (<u>Id.</u> at 156-60). Inspector Navarro testified that the man said that Aleman knew he was wanted and had gone "back to Mexico with his wife." (<u>Id.</u> at 159-60). Inspector Navarro gave the man his contact information and asked him to call if he remembered anything else. (<u>Id.</u> at 161). Navarro never heard back from the man. (<u>Id.</u>).[4]

Meanwhile, Inspector Navarro had obtained a possible address for Aleman's wife, Victoria Aviles, in Wauchula, Florida, and he asked USMS deputies in Florida to follow up. (Tr. at 163-66). Deputies in the Wauchula area reported back later that month that they were not able to find Ms. Aviles in Wauchula, but they did find and interview her sister who stated that Ms. Aviles was in Austin, Texas and that Aleman was from Guerrero, Mexico. (<u>Id.</u> at 167-69). Inspector Navarro then searched for possible addresses for Ms. Aviles in the Austin, Texas area and

---

[4] Aleman argues, and I agree, that the statement by the man in Smyrna that Aleman knew he was wanted and had left for Mexico (Tr. at 159) is inadmissible hearsay and cannot be used to prove either that Aleman knew he was wanted or that he had fled to Mexico.

developed two addresses for possible relatives that ultimately did not produce any helpful information regarding Ms. Aviles's whereabouts. (Id. at 169-73).  Inspector Navarro continued to look for Ms. Aviles by performing database checks on her approximately once a year. (Id. at 174-75).

In January 2009, Inspector Navarro sent a report to the DEA field office in Mexico City, Mexico stating that Aleman was possibly living in Guerrero, Mexico. (Tr. at 178). Inspector Navarro hoped that Mexico City DEA agents might be able to use Mexican databases to find information on Aleman's whereabouts. (Id. at 179).

Around the same time, Inspector Navarro began working with the Department of Justice to obtain an INTERPOL Red Notice for Aleman. (Tr. at 182-83).  A Red Notice is a notice to INTERPOL member countries (including Mexico and the United States) that a person is wanted for prosecution in another member country, and it serves to provide notice if the person crosses a border into or out of an INTERPOL member country. (Id. at 179-81). A Red Notice was issued for Aleman, which went into effect on September 11, 2009. (Gov't Ex. 8).  It contained his identifiers, such as his photograph, fingerprints, place of birth (Guerrero, Mexico), and the region/country he was likely to visit (Mexico), as well as the basic facts of the alleged offense.  (Id. at 1-2).  The Red Notice requested

Aleman's arrest, and it committed the United States to seeking Aleman's extradition. (Id. at 2-3).

Throughout this time period, Inspector Navarro did a number of other things as part of his efforts to locate Aleman. He checked multiple consumer databases, such as Accurint, Auto Track, and CLEAR, every six months for new information on Aleman. (Tr. at 151, 153-55). He requested records on Aleman from the Georgia Department of Labor to see if any employment data was reported for him. (Id. at 183-85; Gov't Ex. 9). He returned to the Smyrna apartment complex, but did not find the brother again or get any new leads. (Tr. at 187-89). And he followed up with the DEA for leads. (Id.). None of these efforts, however, bore any fruit.

In April 2013, Inspector Navarro learned from his Florida colleagues that Victoria Aviles, Aleman's now ex-wife, had obtained a new Florida driver's license, and he sent USMS deputies to interview Ms. Aviles. (Tr. at 175-76). Ms. Aviles was cooperative and informed the deputies that she had not seen or heard from Aleman since she bailed him out of jail in 2005, except that she had received a text that very day from Aleman asking about his kids. (Id. at 58-59; 192-93). Aviles showed the deputies the text message, which was sent from a Mexican telephone number. (Id. at 58). Aviles testified that the text was the only

8

communication she had had with Aleman since 2005.  (Id. at 59).  Aviles responded to the text, saying that the kids were fine. (Id. at 69).  She did not tell Aleman about the USMS visit, nor did the USMS ask her to tell Aleman the USMS was looking for him.[5] (Id. at 69-70).  During that meeting with the USMS, Ms. Aviles told them that Aleman was from Salitre, Guerrero, Mexico and that he might be living with his parents. (Id. at 60).  She also provided them with the name of Aleman's mother and the Mexican telephone number Aleman was using. (Id. at 194).

Following the April 2013 meeting with Ms. Aviles, on July 9, 2013, Inspector Navarro contacted the U.S. Attorney's Office in Atlanta, Georgia, stating that Aleman might be living with his parents in Guerrero, Mexico.  His reason for doing so was to obtain a provisional arrest warrant.  (Tr. at 195-99; Gov't Ex. 10).  A provisional arrest warrant is a warrant issued to allow a foreign country to arrest someone on the authority of a United States indictment.  (Tr. at 228).  Assistant United States Attorney Cassandra Schansman began working on Aleman's provisional arrest warrant and extradition package in June 2013. (Id. at 226-27).

---

[5]  In Inspector Navarro's experience, if a fugitive knows that law enforcement has his telephone number, the fugitive is likely to change the number; thus, the deputies would have deliberately avoided alerting Aleman to the fact that they had his telephone number so as to preserve the telephone number's potential usefulness in locating him later on.  (Id. at 194-95).

She coordinated with the Office of International Affairs ("OIA") to complete the extradition packet. (Id. at 227-28). She testified that to obtain a provisional arrest warrant, a "lay witness affidavit" was required and that she sought cooperation in this regard from Aleman's co-defendant, Filiberto Alanis-Soto, who was in custody at the time. (Id. at 144-45, 231-32). In the summer of 2013, she secured counsel for Alanis-Soto, and he signed a "Post-Plea Cooperation Agreement," which paved the way for him to serve as the affiant for the lay witness affidavit. (Id. at 234-37; Gov't Ex. 30).

In describing Aleman's location in the provisional arrest warrant request, AUSA Schansman used the information she had at that time, i.e., that Aleman was living in Guerrero, Mexico with his parents. (Tr. at 233). AUSA Schansman sent this information as part of the provisional arrest warrant application to OIA by e-mail in January 2014. (Id. at 230; Gov't Ex. 14 at 3-4). Within a few days, the OIA responded that a more specific location was required. (Tr. at 239-40; Gov't Ex. 14 at 2). Specifically, the OIA needed "a neighborhood, a small town, or a small section within a city" to proceed. (Gov't Ex. 14 at 1). AUSA Schansman then asked Inspector Navarro to obtain more information. (Tr. at 240; Gov't Ex. 11).

In response to the request, USMS deputies re-interviewed Ms. Aviles in April 2014, at which time she provided the names of both of Aleman's parents and advised that she had heard through Facebook that Aleman's parents had received visas to the United States. (Tr. at 61-62, 199-202).  Using this information, in April 2014, the USMS obtained copies of visa applications for Aleman's parents, which showed an address in the town of Zirapitiro in the state of Guerrero, Mexico. (Id. at 202-03; Gov't Ex. 12).   In May 2014, AUSA Schansman sent this additional information to the OIA to be included in the provisional arrest warrant application. (Id. 241-242; Gov't Exs. 12, 15).

The fugitive case finally broke in July 2014, when Aleman was arrested in Mexico on drug charges.  On August 5, 2014, while the provisional arrest warrant was still in progress, AUSA Schansman was notified of Aleman's arrest. (Tr. at 251, Gov't Ex. 13).  After further revisions to the affidavit, the OIA approved and transmitted the provisional arrest warrant to Mexico in December 2014. (Tr. at 230; Gov't Ex. 18).  In August 2015, Aleman was arrested on the provisional arrest warrant. (Tr. at 250; Gov't Ex. 20). The formal extradition packet was then sent to Mexico in October 2015, and Aleman was extradited from Mexico to the United States in March 2016. (Tr. at 231, 252).

11

The Government also presented the testimony of DEA Special Agent Eric Trevino, who is a criminal investigator working in the DEA's field office in Mexico City, Mexico. (Tr. at 265-66).  Special Agent Trevino had no personal knowledge about this case or the Government's efforts to locate and arrest Aleman. He testified generally about the DEA's operational limitations in Mexico.  He testified, for example, that the DEA cannot subpoena Mexican records, access Mexican databases, make arrests, or order Mexican law enforcement to arrest U.S. fugitives. (Id. at 269). He testified that both Mexican law enforcement and the DEA are very limited in their ability to conduct surveillance, make arrests, and obtain records in Mexico. (Id. at 269-71).  Special Agent Trevino also described the particular difficulty of operating in the state of Guerrero.  (Id. at 278).  He testified that given the violence and danger to law enforcement officers in Guerrero, officers usually wait for fugitives to leave that part of Mexico before attempting to apprehend them. (Id.; Gov't Ex. 23, 24).

## II.    DISCUSSION

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This right "is as fundamental as any of the rights secured by the Sixth Amendment." Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).   In

determining whether a post-indictment delay has caused a speedy trial violation, courts look to the four-factor balancing test established in Barker v. Wingo, 407 U.S. 514 (1972).  The factors used in the balancing test are: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. Id. at 530.  If the first three factors "weigh heavily against the Government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a speedy trial."  United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006) (citing Doggett v. United States, 505 U.S. 647 (1992)).

### A. Length of the Delay

The first factor of the Barker balancing test—length of the delay—serves as a "double enquiry."  United States v. Villarreal, 613 F.3d 1344, 1350 (11th Cir. 2010) (quoting Doggett, 505 U.S. at 651).  First, it operates as a threshold inquiry that the defendant must satisfy in order for the court to weigh the remaining three factors, and second, it requires examination of "the extent to which the delay stretches beyond the bare minimum needed to satisfy the threshold showing of presumptive prejudice."  Villarreal, 613 F.3d at 1350 (quoting Doggett, 505 U.S. at 652).

In this case, the delay about which Aleman complains is limited to the time between his indictment in 2008 and his arrest in 2016, which the parties agree is approximately eight years.  (Doc. 214 at 1; Doc. 256 at 4-5).  In this circuit, post-indictment delays exceeding one year are generally considered to be "presumptively prejudicial."  See Ingram, 446 F.3d at 1336. In this instance, the Government concedes that the eight-year delay more than satisfies the threshold inquiry of presumptive prejudice and that this factor weighs heavily against the Government.  (Doc. 256 at 4-5).  I conclude that (1) the eight-year delay in this case clearly satisfies the threshold inquiry of presumptive prejudice, and (2) the delay extended significantly beyond the minimum necessary to show presumptive prejudice.  This factor, therefore, weighs heavily against the Government.  See Villarreal, 613 F.3d at 1350-51.

## B. Reason for the Delay

Turning to the second factor, reason for delay, the Court must apportion blame for the post-indictment delay. The Government's obligation to apprehend fugitives in a timely manner is balanced against the potential unfairness of excessively second-guessing the Government's investigatory efforts.  With respect to the second Barker factor, "[t]he Government bears the burden of establishing valid reasons for the delay." See Villarreal, 613 F. 3d at 1351.  Courts "allocate

14

different weight to different reasons for delay." Id. The Supreme Court has grouped possible reasons for delay into three general categories: valid, improper, or neutral. See Barker, 407 U.S. at 531. A valid reason, such as a missing witness, serves to justify appropriate delay and weighs in favor of the Government, while an improper reason, such as a deliberate attempt to delay the trial for the purpose of hampering the defense, weighs heavily against the Government. Id. A more neutral reason, such as negligence or overcrowded courts, would still weigh against the Government, because "the ultimate responsibility for such circumstances must rest with [it] rather than with the defendant," but such neutral reasons are weighted less heavily than improper reasons. Id.

Here, Aleman does not argue that there is any improper reason for the delay in this case or any bad faith on the part of the Government's fugitive investigation, and he has presented no evidence that would support such a conclusion. Rather, he argues that the Government did not act with reasonable diligence. Aleman states, for example, that "there was no serious effort to try to locate Aleman," and "the government's diligence was clearly insufficient." (Doc. 269 at 3, 7). In response, the Government argues that Aleman was intentionally evading law enforcement beginning in 2005, and therefore there is a valid reason for delay. (Doc. 278 at 21-

23).  The Government also argues that law enforcement acted with reasonable diligence in its efforts to locate and arrest Aleman. (Id. at 25-33).

> *1.  Aleman was intentionally evading law enforcement.*

The Government argues, and I agree, that there is a valid reason for the delay.  The Government has shown that beginning in 2005, Aleman was intentionally evading law enforcement's efforts to locate and arrest him.  It is well settled that the Government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay.  See Villarreal, 613 F.3d at 1353 (affirming a finding that no speedy trial violation occurred where the defendant evaded police by "fleeing to Mexico and leading a paperless life"); United States v. James, 183 F. App'x 923, 927 (11th Cir. 2006) (affirming trial court's conclusion that the defendant shouldered the majority of the responsibility for the delay in his capture due to his use of aliases and fake identification cards); United States v. Valiente-Mejia, No. 04-cr-772-NRB, 2009 WL 3401210, at *7 (S.D.N.Y. Oct. 19, 2009) (ascribing "a meaningful portion of the blame for the post-indictment delay" to a defendant who used an alias to conceal that he was in the country illegally, even though he was not aware of his indictment).

In Villarreal, the Eleventh Circuit found no speedy trial violation, despite a ten-year delay, based in part on the facts that the defendant knowingly fled from

16

the country and that the Government was diligent in trying to capture him, including by using various national databases and by placing lookouts at border crossings. 613 F.3d at 1353.  In Villarreal, even though there were some gaps in the Government's efforts to locate the defendant, the Eleventh Circuit nevertheless affirmed the district court's decision to weigh the second Barker factor against the defendant.  Id. at 1353.

Here, the record shows that Aleman, like the defendant in Villarreal, was responsible for the delay because he was evading law enforcement efforts to arrest him.  In May 2005, Aleman failed to appear for his arraignment on drug trafficking charges in Florida, and he apparently went into hiding immediately after being bailed out, abandoning his wife and children.  (Tr. at 27, 53-56, 58-59; Gov't Exs. 3, 4).  This evidence demonstrates an intentional evasion to avoid prosecution. See Villarreal, 613 F.3d at 1353.

In his briefs to this Court, Aleman simply ignores the fact that he was a fugitive from justice since 2005, focusing instead on the lack of evidence that he knew about the federal indictment. Rather than addressing his fugitive status, Aleman instead argues that he cannot be held responsible for the delay because he did not know about the indictment ***in this case*** and therefore "had no reason to hide."  (Doc. 269 at 6-7).  This argument rings hollow.  The evidence shows that

17

Aleman deliberately was avoiding capture beginning in 2005 when he jumped bail on the state court drug trafficking charge and fled, leaving his home and family behind.  His efforts to avoid capture on the Florida charge equally served to hinder his capture on this case.  See Valiente-Mejia, 2009 WL 3401210, at *7 (noting that a defendant who was unaware of a pending indictment but was evading immigration officials because he was undocumented was responsible for the pre-arrest delay in his case, stating "if he had known about the indictment, he simply would have redoubled his efforts to evade law enforcement").

     2.  *The Government made a diligent, good-faith effort to locate Aleman.*

Aleman argues that the Government's lack of diligence is the true reason for the delay.  According to Aleman, "it was perfectly obvious to anyone, in the exercise of common sense, that if Aleman was not with his family in Florida, he was likely with his family in Mexico."  (Doc. 269 at 17).  I disagree.

Here, law enforcement took many active steps to effectuate the arrest warrant, even if these efforts bore no fruit. Law enforcement routinely checked credit and criminal databases for information that might lead to Aleman's whereabouts, and they ensured that the warrant remained active and that the information was correct in various law enforcement databases. (Tr. at 31, 32, 40; Gov't Ex. 5).  Specifically, from 2008 to 2014, the DEA ensured that the warrant

remained active in law enforcement databases every year, and Inspector Navarro checked credit databases for Aleman every six months and for Ms. Aviles annually.  Such evidence of periodic checks of databases is evidence that weighs in favor of finding that the Government diligently pursued its subject. See Villarreal, 613. F.3d at 1352 (finding that annual database checks showed diligence); United States v. Bagga, 782 F.2d 1541, 1544 (11th Cir. 1986) (noting that where law enforcement registered the fugitive's name with the nationwide crime information network and took steps to apprehend him if and when he sought to return to the United States, law enforcement showed diligence and good faith); United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988) (citing as an example of diligence the filing of a fugitive report with NCIS).

Other efforts further support a finding of reasonable diligence on the part of law enforcement.  Inspector Navarro undertook a concerted effort to identify, locate, and interview Ms. Aviles for information on Aleman, including utilizing (albeit unsuccessfully) USMS deputies in Florida and Texas in an attempt to locate her. (Tr. at 163-66, 169-73).  And, when Navarro received word in April 2013 that Ms. Aviles was back in Florida, he promptly sent USMS deputies there to interview her.  (Id. at 175-76).  Such efforts to interview people who know a

fugitive, such as neighbors and family members, is evidence of reasonable diligence. See Villarreal, 613 F.3d at 1352; Bagga, 782 F.2d at 1543.

Aleman complains that law enforcement should have known that he was in Mexico.   He argues, "[t]he Mexican connection was well-known to law enforcement from the beginning of the investigation."   (Doc. 269 at 16).   The Government presented evidence, however, that the fugitive investigation did indeed make its way into Mexico.   Inspector Navarro notified the DEA in Mexico that Aleman might be in Guerrero, and he obtained a Red Notice for Aleman in September 2009. (Tr. at 178-79; Gov't Ex. 8).   Although neither the DEA nor the Red Notice ultimately succeeded in locating Aleman, these were appropriate steps towards locating a fugitive who might have been located in Mexico.   See Villarreal, 613. F.3d at 1352-53 (considering the placement of a border lookout to notify immigration officials if the defendant crossed an official border entry point to be evidence of diligence).   The Government also presented compelling evidence that it was limited in its ability to obtain intelligence from Mexico and to take action to locate and arrest him there.   According to Special Agent Trevino, United States law enforcement in the state of Guerrero, Mexico could not conduct surveillance, make arrests, or even obtain records in that part of Mexico. (Tr. at 269).   The Government also presented evidence that the state of Guerrero, where

20

they suspected Aleman might be, was so dangerous that Mexican law enforcement could not safely enter into the rural parts. (Id. at 277-78, stating "oftentimes that it is prudent to wait for fugitives to leave Guerrero and in particular the rural parts of Guerrero because they are so hard to access, they are so hostile and violent that it is difficult to get teams in to do the basic investigative work of surveillance and then, of course, obviously the actual arrest operation."). Thus, the Government's ability to further the investigation in Mexico was limited, but it was diligent in pursuing Aleman nonetheless.

I find Aleman's arguments about the Government's alleged lack of diligence (Doc. 269 at 14-26) to be unsupported and unpersuasive, especially in light of the fact that Aleman was apparently living a low-profile, fugitive existence in a dangerous, remote, and rural part of Mexico. Aleman asserts that Alanis-Soto, Juan Aleman, and/or Ms. Aviles could have provided Aleman's precise location sooner (id. at 22-25), but this is mere speculation unsupported by the record. Even if law enforcement could have determined Aleman's parents' address sooner, there was no way for them to know that Aleman was living there. The failure to identify Aleman's parents' address in Mexico was not an egregious oversight, as portrayed by Aleman, given law enforcement's continuous, good-faith efforts to locate Aleman in other ways and the lack of concrete evidence about where he might be

living.  Aleman also claims that the Government should have issued a Red Notice sooner, worked more quickly to obtain the provisional arrest warrant, and looked at his immigration file sooner (id. at 17, 21, 25-26), but there is no evidence that speeding up these processes would have shortened the delay.  Indeed, it was Aleman's arrest on unrelated charges that ultimately led to his capture.

The Government's efforts to locate Aleman greatly exceed the attempts made by law enforcement in cases finding of a lack of diligence.  See, e.g., Ingram, 446 F.3d at 1339-40 (concluding that the Government's negligence weighed heavily against it where the arresting agent knew where the defendant lived and worked, failed to contact the defendant's brother who was a policeman, and did not refer the case to any other law enforcement agency); United States v. Clark, 83 F.3d 1350, 1352 (11th Cir. 1996) (finding a lack of diligence where the defendant continuously resided in the same apartment listed on the arrest warrant, attended classes at the same local university as he had prior to his alleged illegal activities, and never attempted to elude the authorities).

3.  *Summary of the Second Barker Factor*

In sum, the evidence presented in connection with the motion to dismiss shows that (1) Aleman is primarily responsible for the delay due to his intentional

evasion of prosecution, and (2) law enforcement acted diligently to locate him. Accordingly, I conclude that this factor weighs heavily against Aleman.[6]

## C. Aleman's Assertion of his Right to a Speedy Trial

The third Barker factor, assertion of the speedy trial right, weighs heavily against a defendant where he acquiesces in the delay. Doggett, 505 U.S. at 653. Where the defendant is unaware of the indictment, however, he cannot "be taxed for invoking his speedy trial right only after his arrest." Id. at 654.   In the context of a pre-arrest delay, if the defendant is aware of the indictment before his arrest, but waits until he is arrested to invoke his right to a speedy trial, then this factor weighs heavily against him.   On the other hand, if the defendant does not learn about the indictment until his arrest, and afterwards promptly asserts his speedy

---

[6] I note that even if the second factor weighed less heavily against Aleman, or even slightly weighed against the Government, Aleman would still be required to show actual prejudice at the fourth Barker step. See Ingram, 446 F.3d at 1336 (noting that the defendant must show actual prejudice unless each of the first three factors weigh heavily against the Government).   Here, Aleman asserts merely negligence, or lack of diligence; he does not claim that law enforcement acted in bad faith.   In the absence of bad faith, this factor cannot weigh heavily against the Government.   See Villarreal, 613 F.3d at 1351.  There is no evidence that anyone involved in the fugitive investigation failed to effectuate the arrest purposefully or with bad intent.   Accordingly, even if Aleman disagrees with my conclusion that this factor weighs heavily against him, he has no legitimate argument that the second factor weighs heavily against the Government or that he should not be required to show actual prejudice at step four.

trial right, then this factor weighs heavily against the Government. <u>United States v. Spaulding</u>, 322 F. App'x 942, 947 (11th Cir. 2009) (unpublished).

In this case, there is no direct evidence that Aleman was aware of the indictment before he was arrested. The Government argues that Aleman was constructively on notice that he was being sought by law enforcement in Atlanta on this case when his co-defendants Filiberto Alanis-Soto (who grew up with Aleman in Guerrero, Mexico) and Juan Aleman (Aleman's uncle) were arrested. (Tr. at 110-112, 114, 119, 138-39, 234). I find this evidence insufficient to establish constructive knowledge. The Government presented no evidence that Aleman was in communication with anyone in the United States during the relevant time, other than Ms. Aviles on one occasion, and there was no evidence about specific evasive tactics that Aleman might have taken upon learning that his co-defendants had been arrested. Without more, I cannot conclude that Aleman had constructive knowledge of the indictment in this case. <u>See</u> <u>United States v. Garza</u>, No. 1:02-CR-584-CAP-AJB, Doc. 58, slip op. at 1, 39-40 (N.D. Ga. Dec. 22, 2014) (finding constructive knowledge where the defendant knew that an associate in his drug business had been arrested, knew people who were cooperating with the Government, knew that he was the subject of an investigation, stated that he was

not going to voluntarily surrender to authorities, and took steps toward moving drug money to Mexico).

At attorney was appointed to represent Aleman on March 25, 2016, and Aleman timely asserted his speedy trial right less than a month later, on April 20, 2016.  (Docs. 201, 214).  Under these circumstances, Aleman should not "be taxed for invoking his speedy trial right only after his arrest," see Doggett, 505 U.S. at 654, and therefore this factor weighs in favor of Aleman.[7]

### D. Actual Prejudice

Where, as here, the first three Barker factors do not all weigh heavily against the Government, "the defendant generally must demonstrate actual prejudice to succeed on his speedy trial claim." Villarreal, 613 F.3d at 1355 (citation omitted). "[T]he Supreme Court has recognized that a defendant generally cannot establish a Sixth Amendment speedy trial claim, however long the delay, if the government pursued the prosecution with 'reasonable diligence,' and the defendant fails to show that the delay resulted in 'specific prejudice to his defense.'" United States v.

---

[7] My decision to weigh the third factor in Aleman's favor is of little consequence to him in light of my conclusion that the second factor—reason for the delay—weighs against him; he must still proceed to the fourth factor and establish actual prejudice.  See United States v. Schlei, 122 F.3d 944, 988 (11th Cir. 1997) ("Although factors one and three weigh in favor of Schlei, the second factor, the reasons for the delay, weighs in favor of the Government. Therefore, Schlei must establish actual prejudice.")

Harris, 376 F.3d 1282, 1290 (11th Cir. 2004) (quoting Doggett, 404 U.S. at 656).

Conclusory allegations of prejudice are insufficient to constitute proof of actual

prejudice.  United States v. Hayes, 40 F.3d 362, 366 (11th Cir. 1996) (citing, as an

example, "unsubstantiated allegations of witnesses' faded memories," and holding

that a five-year delay between indictment and trial did not violate defendant's

speedy trial right).

Aleman first argues that his defense has been (or may be) prejudiced

because there is a possibility that he will not be able to get all of the alibi testimony

from his Mexican witnesses.  In his supplemental motion, however, Aleman

summarizes the substance of the testimony he expects to obtain from witnesses in

Mexico who will testify that Aleman was in Cutzamala de Pinzon, Mexico

throughout all of 2008, and none claim to have suffered any loss of memory.

Although Aleman claims that it will be difficult to obtain the testimony of these

witnesses because they live in rural Mexico (Doc. 269 at 31), he has presented no

evidence that this fact would have been any different if the trial had occurred

sooner.

Aleman also argues that Alanis-Soto's incriminating testimony may be due

to his failing memory or confusion due to the passage of time (Doc. 269 at 29), but

Aleman has failed to provide any specifics in support of this argument.  "[V]ague

26

assertions of faded memory. . . without connecting this loss to any material fact in issue" does not satisfy the required showing of prejudice.  United States v. Burke, 673 F. Supp. 1574, 1580 (N.D. Ga. 1986); see also Clark, 83 F.3d at 1354 ("Clark's mere conclusory allegations of impairment are insufficient to constitute proof of actual prejudice.").

Aleman also argues that he has been prejudiced because Juan Aleman has been deported and is not available as a witness for the defense (Doc. 269 at 30), but he has failed to show what evidence Juan Aleman might have provided that would have been helpful to his defense.  Moreover, the unavailability of a co-conspirator to appear at trial will likely prejudice the Government as much as it might prejudice Aleman.

Next, Aleman makes a vague assertion that he is now unable to locate documentary evidence to support his alibi defense due to the passage of time (id. at 30-31), but he again provides no specifics in support of this assertion and has failed to show what steps were taken to locate documents that do exist.  See Villarreal, 613 F.3d at 1356-57.

Finally, Aleman complains that in connection with the evidentiary hearing in this case on the motion to dismiss, Detective Nicholson served Ms. Aviles with a subpoena for her testimony and in doing so, told Ms. Aviles that Aleman was

"dangerous" and that he had "killed a person or two."  (Tr. at 33-34, 36, 62).

Aleman argues that Ms. Aviles, who reportedly was poised to testify in support of

his alibi defense, has now been intimidated into silence due to Detective

Nicholson's statements that Aleman is a drug dealer and a murderer. (Doc. 269 at

27-28).    Both Detective Nicholson and Ms. Aviles were asked about this incident

at the hearing.  Detective Nicholson testified that he did not intend to affect Ms.

Aviles's testimony, or to coerce or threaten her; rather, he only intended to impress

on Ms. Aviles the importance of contacting the prosecutor about the subpoena. (Tr.

at 34).  Ms. Aviles testified that she recalled the comments, but that they did not

affect her testimony at the hearing in any way. (Tr. at 62-63).  Aleman has not

identified anything in the record to support his contention that Ms. Aviles would

have testified for him but for Detective Nicholson's remark.  Thus, Aleman has

failed to show that the delay resulted in specific prejudice to his defense.

### III.   CONCLUSION

Aleman's Sixth Amendment speedy trial claim fails because he has not

established a necessary factor, i.e., that he suffered actual prejudice as a result of

the delay in his prosecution. See United States v. Harris, 376 F.3d 1282, 1292

(11th Cir. 2004).  Accordingly, I **RECOMMEND** that the Motion to Dismiss Due

to Post-Indictment, Pre-Arrest Delay (Doc. 214) be **DENIED**.

In addition, it appears that there are no further outstanding pretrial or discovery matters for me to address.  Accordingly, this case is **CERTIFIED** as ready for trial.

This 17th day of January, 2017.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE