**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**BLAS ALEMAN,**

**Defendant.**

**1:08-cr-00223-WSD-2**

## OPINION AND ORDER

This matter is before the Court on Defendant Blas Aleman's ("Aleman")

Motion to Dismiss Due to Post-Indictment, Pre-Arrest Delay [214] (the "Motion").

Magistrate Judge Catherine M. Salinas, after conducting an extended evidentiary

hearing, issued her Report and Recommendation ("R&R") on the Motion [284],

finding that Aleman did not suffer actual prejudice by the delay in his prosecution

and recommending that the Motion be denied.  Also before the Court are Aleman's

Objections to the R&R [288].

## I.    INTRODUCTION

Aleman was charged, in an indictment dated June 10, 2008, with conspiracy

to possess cocaine and methamphetamine with intent to distribute, in violation of

21 U.S.C. § 846, 841(b)(1)(A)(ii)(II) and 841(b)(1)(A)(viii).  ([10]).  A warrant for

Aleman's arrest was issued the same day (the "Arrest Warrant") he was indicted.

1

(See [14]).  Aleman was eventually arrested on the warrant in March 2016, following his arrest in Mexico on drug charges.  He was extradited to the United States on the charges in this case.

## II.   BACKGROUND FACTS

In May 2005, three years before the indictment in this prosecution was returned and the Arrest Warrant was issued, Aleman was arrested in Florida on state charges of trafficking in methamphetamine.  Victoria Aviles ("Aviles"), Aleman's then-wife and the mother of his children, posted $15,000.00 for Aleman's bail.  She borrowed the funds from one of Aleman's relatives.  The day after Aleman was released from detention, he spent two hours with Aviles at their home, and then he left.  Aleman did not appear at his arraignment on the state drug trafficking charges.  In June 2005, the Florida court issued its warrant for Aleman's arrest for failing to appear at his arraignment.  Neither Aviles nor her children heard from Aleman for eight (8) years after he went missing.

Detective Clay Nicholson, who was involved in the Florida case brought against Aleman, searched for Aleman unsuccessfully from June 2005 to March 2008.  In 2008, Detective Nicholson learned from a confidential source that Aleman was in Atlanta where he was involved in drug trafficking with his uncle, Juan Aleman.  Detective Nicholson arranged for his confidential informant to

2

provide information to law enforcement in the Atlanta office of the Drug

Enforcement Administration ("DEA"), which opened an investigation of Aleman.

DEA Special Agent Michael Bagley testified that, in early March 2008,

when serving on a surveillance team, he took photographs of Blas Aleman and

Juan Aleman at a car dealership and at a hotel in Atlanta.  The photographs show

Aleman in Atlanta in 2008.

Aleman states that he was not in Atlanta in 2008, that Juan Aleman is not his

uncle, and that he does not know Juan Aleman.  Immigration documents, which

Aleman supplied, however, show that Aleman's grandparents have the same name

as Juan Aleman's parents.  Government immigration file documents show that

Juan Aleman was born in El Salitre, Guerrero, Mexico to Tomasa Mederos and

Juan Aleman.  Aleman's birth certificate has this same lineage information,

specifically that Tomasa Mederos and Juan Aleman are his grandparents.[1]

The DEA investigation resulted in the drug trafficking conspiracy charges

brought against Aleman and his co-conspirators, including Defendant Filiberto

Alanis-Soto ("Alanis-Soto"), on June 10, 2008.

---

[1]      Aleman's parents deny that they know anyone named Juan Aleman.

A.   <u>Search for Aleman</u>

After the indictment was returned and the Arrest Warrant issued, Special Agent Bagley and others tried to find Aleman to arrest him.  Aleman could not be located.  Unable to find him, and according to standard fugitive search processes, the DEA turned the search for Aleman over to the United States Marshals Service ("USMS").

While the USMS undertook to locate Aleman, DEA Special Agent Bagley continued his efforts to find Aleman.  Each year, beginning in 2008, he reviewed information in the DEA's Narcotics and Dangerous Drugs Information System to ensure that the Arrest Warrant was active in the National Crime Information Center ("NCIC") database.  He also ensured that the El Paso Intelligence Center database continued to list correct information about Aleman.  These databases and intelligence systems are searched by law enforcement agencies conducting investigations to check on information about individuals they encounter in their law enforcement work.  They would cause a law enforcement officer to notify the DEA if Aleman was encountered.  By ensuring the accuracy of the information in the NCIC and El Paso databases, the DEA ensured that law enforcement across the country were involved in the search for Aleman.

Criminal Inspector Alberto Navarro was in charge of the USMS effort to locate Aleman.  When assigned the case in June 2008, Inspector Navarro conducted internet and credit searches for information that could help locate Aleman.  A Social Security number for Aleman, provided to Inspector Navarro by the DEA, disclosed an address in Smyrna, Georgia, at which it was possible that Aleman resided.  The address was in an apartment complex.  Inspector Navarro first conducted surveillance at the apartment address.  He later contacted apartment complex neighbors and employees but was unable to develop useful information about Aleman's whereabouts.  Inspector Navarro then knocked on the door of the apartment at which it was thought that Aleman might reside.  A person who identified himself as Aleman's brother told Inspector Navarro that Aleman knew he was wanted and that Aleman had returned "to Mexico with his wife."  Inspector Navarro gave the brother his contact information and asked him to call if he remembered anything further.  The brother did not call.

Inspector Navarro then obtained a possible address for Aviles in Wauchula, Florida.  USMS deputies in Wauchula went to that residence to investigate.  They did not find Aviles, but identified and interviewed Aviles' sister who reported that Aviles lived in Austin, Texas.  She also told investigators that Aleman was from Guerrero, Mexico.

5

Inspector Navarro searched for possible addresses for Aviles in Austin and developed two address possibilities, neither of which helped him locate Aviles.

In addition to ensuring that accurate information for Aleman still was resident in the NCIC and El Paso databases, each year Inspector Navarro reviewed the database information to ensure it was accessible.  He also conducted internet searches for information about Aviles.

B.    Mexico

There are various operational limitations on DEA investigations in Mexico. The DEA cannot subpoena Mexican records, cannot access Mexican databases, cannot make arrests in Mexico, and cannot order Mexican law enforcement to arrest United States fugitives.  Mexican law enforcement resources are limited and that impacts their ability, and the ability of the DEA, to conduct surveillance and obtain records in Mexico.  It is particularly hard to operate in Guerrero, Mexico because of the violence in that area and the danger presented there to law enforcement personnel generally.  Because of danger in Guerrero, the DEA generally waits for fugitives to depart the Guerrero area before attempting to apprehend them.  Aleman is from Guerrero.

In the absence of success locating Aleman or Aviles in the United States, the USMS turned its search efforts toward Mexico.  In January 2009, Inspector

Navarro sent a report to the DEA field office in Mexico City, Mexico stating it was possible that Aleman was in Guerrero.  Inspector Navarro hoped that the DEA might obtain access to Mexican databases for information about Aleman. Inspector Navarro also contacted the Department of Justice for help in obtaining an INTERPOL Red Notice for Aleman.  A Red Notice advises all INTERPOL member countries, which includes Mexico, that an individual is wanted for prosecution in a member country and if a wanted person crosses an INTERPOL member's border the country posting the notice is advised.  The Red Notice contains various identifying information including photographs, fingerprints, place of birth, the basic facts of the offense alleged against the person sought, and the region or country the person is likely to visit.  The Red Notice for Aleman contained this information and it was posted on September 11, 2009.  The United States committed in the notice to seek extradition if Aleman was encountered.

With investigative tools already in place, Inspector Navarro conducted other investigative activity.  Every six months, he checked various consumer databases including Accurint, Auto Track, and CLEAR.  He asked the Georgia Department of Labor for employment data about Aleman.  He revisited the Smyrna apartment complex, but Aleman's brother was not there, and no new leads were developed. He followed up with the DEA for leads.

7

C.   <u>Aviles Contact</u>

In April 2013, USMS personnel in Florida told Inspector Navarro that Aviles, now divorced from Aleman, had applied for a new Florida driver's license. USMS deputies were sent to interview her.  Aviles was cooperative when contacted.  She told the investigating USMS personnel that she had not seen or heard from Aleman for the eight years since she bailed him out of jail, except, on the day she was interviewed, she had received the first contact from Aleman since he left in 2005.  The contact was by text message and, in it, Aleman asked about his children.[2]  Aviles responded to the text message but claims she did not tell Aleman about the USMS inquiry.  She suggested to investigating agents that Aleman might be living with his parents in Guerrero, and she gave them Aleman's mother's name and the Mexican phone number Aleman was using.

Inspector Navarro told the United States Attorney's Office ("USAO") in Atlanta that Aleman might be living in Guerrero and requested that a provisional arrest warrant be obtained to be executed in Mexico.  The office began working on the warrant in June 2013.  The office worked with the Department of Justice Office

---

[2]   It is hard to believe this text message was a coincidence considering the length of time Aviles claimed she had not been contacted, that she and Aleman would have the same phone numbers, and that the message would be a very short general inquiry about his children.  It is more likely that Aviles was cooperating in helping Aleman avoid detection.

of International Affairs ("OIA") in Washington, D.C.  An affidavit from a lay person was required to support the warrant.  The only available affiant was Aleman's codefendant Alanis-Soto, who was in custody, having entered a guilty plea to the same indicted offense on which Aleman was charged.  Still in custody when the affidavit was requested, counsel was arranged to represent Alanis-Soto.  Alanis-Soto's counsel negotiated a post-plea agreement with the Government on behalf of Alanis-Soto in connection with the Government's request for the affidavit.  The affidavit was obtained in the summer of 2013.  The warrant request was sent to OIA who advised that a more specific description of Aleman's location was required.  OIA advised that the application had to specify a neighborhood, small town, or small section of the city where Aleman could be located.

The Atlanta USAO told Inspector Navarro to obtain this specific location information.  He did, the affidavit was processed, and the provisional arrest warrant was transmitted to Mexico in December 2014.

Although already in Mexican custody on local charges, Aleman was served with the provisional arrest warrant in August 2015.  The United States requested his extradition in October 2015, and he finally was extradited to the United States in March 2016.

## III.    STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted).  With respect to those findings and recommendations to which a party has not asserted objections, the Court must conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

Aleman filed objections to the R&R.  The objections are 30-pages long and consist of a relatively rambling discussion of facts, witness credibility issues, and Aleman's need to depose Dr. Leocadio Carbajal Abonsa, who was not deposed in Mexico City in a previous court-approved trip to conduct depositions in Mexico,

including one of Dr. Carbajal.[3]  Aleman advances the general argument that the Government could and should have arrested Aleman sooner on the Arrest Warrant and thus the Magistrate Judge's conclusion that the Government was sufficiently diligent in seeking Aleman's arrest is wrong.  Aleman argues the delay in the arrest was too long and that his Sixth Amendment trial rights have been violated.  The Court has reviewed the Objections and, while not well organized, believes they fall into the following categories:

1.     Diligence.  Aleman claims that the Magistrate Judge erred in finding that the USMS engaged in sufficient investigative activity to find Aleman to arrest him on the Arrest Warrant.  Aleman claims that the USMS was not sufficiently diligent in seeking to arrest him, including because the USMS did not follow up with Aviles, and that they should have investigated if Aleman was in his hometown of Guerrero, Mexico, and arrested him there.  Aleman claims the Magistrate Judge should have found that the USMS deliberately failed to engage in a more robust search for Aleman because they were content to hope he would encounter law enforcement and be arrested on the outstanding warrant.

---

[3]     Aleman filed a second motion to depose Dr. Carbajal, now in his hometown in Guerrero.  ([287]).  The Magistrate Judge denied Aleman's motion [294] to travel to Mexico to Dr. Carbajal's home community to depose him.  Defendant objected to this decision.  ([295]).  The Court overruled the objection on March 1, 2017.  ([303]).

2.     <u>Actual prejudice</u>.  The Magistrate Judge should have found that the delay in the arrest caused Aleman actual prejudice because the facts support an actual prejudice finding.

3.     <u>Omitted facts</u>.  Aleman claims the Magistrate Judge omitted facts in reaching her decision, specifically that Detective Nicholson's confidential source was sent to Atlanta in March 2008, and that he could not identify Aleman from his 2005 driver's license photograph, which Aleman claims is evidence that the Government indicted the wrong individual in this prosecution.

4.     <u>Evidence that Aleman was in Mexico in March and April 2008, when it is alleged he engaged in drug trafficking in the United States</u>.  Aleman claims that witnesses deposed in Mexico support that Aleman was in Mexico in March and April 2008.  Aleman also claims that Dr. Carbajal wrote three prescriptions for him which Aleman claims were for treatment of acute gastritis and that this treatment supports that Aleman was in Mexico in March and April 2008.

5.     <u>Witness credibility</u>.  Aleman claims that "officers testifying about the photos" of Aleman purporting to show Aleman in Atlanta in March and April 2008 are not credible and codefendant Alanis-Soto, who apparently will testify that Aleman engaged in drug trafficking, also is not credible.

6.   <u>Intimidation</u>.  Aleman claims that Aviles and her children refused to state that Aleman was in Florida and later Mexico because investigating agents threatened and intimidated them.

The Court conducts its <u>de novo</u> review of the Magistrate Judge's findings and recommendations to which Aleman appears to object.[4]

## IV.   DISCUSSION

An accused has a fundamental Sixth Amendment right to a speedy trial in a criminal prosecution.  <u>Klopfer v. North Carolina</u>, 386 U.S. 213, 223 (1967).  In evaluating whether this right was extended after an indictment was returned, the Court evaluates whether a post-indictment delay implicates an accused's right to a speedy trial.  In doing so, a court considers four factors:  (i) the length of the delay, (ii) the reason for the delay, (iii) the defendant's assertion of the speedy trial right, and (iv) prejudice to the defendant.  <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972); <u>United States v. Villarreal</u>, 613 F.3d 1344, 1350 (11th Cir. 2010).  If the first three factors "weigh heavily" against the government, a defendant is not required to show actual prejudice.  <u>United States v. Ingram</u>, 446 F.3d 1332, 1336 (11th Cir. 2006) (citing <u>Doggett v. United States</u>, 505 U.S. 647 (1992)).  The Court considers these factors which are implicated in Aleman's objections.

---

[4]   For those findings and recommendations to which Aleman has not objected, the Court does not find any plain error in them.

A.   <u>Length of Delay</u>

There are two analyses required in evaluating the length of delay.  The first

is whether the "interval between accusation and trial has crossed the threshold

dividing ordinary from 'presumptively prejudicial' delay."  <u>Id.</u> at 336 (citation

omitted).  The second factor requires examination of "the extent to which the delay

stretches beyond the bare minimum to satisfy the threshold showing of

presumptive prejudice."  <u>Villarreal</u>, 613 F.3d at 1350 (internal quotation marks

omitted) (citing <u>Doggett</u>, 505 U.S. at 652).  The Government acknowledges that

the time between the return of the indictment and trial are presumptively

prejudicial and exceeds the threshold inquiry of presumptive prejudice.  This factor

weighs heavily against the Government.

B.   <u>Reason for the Delay</u>

The Government has the burden to establish valid reasons for the delay.  <u>See</u>

<u>Villarreal</u>, 613 F.3d at 1351.  Different reasons are given different weight.  A

deliberate or improper delay is weighted heavily against the Government.  <u>Id.</u>

Neutral reasons for delay, such as negligence or overcrowded courts, may be

considered because the Government is responsible for these circumstances, but

these delays are weighted less heavily than improper delays.  <u>Id.</u>  A valid reason,

such as a missing witness, justifies an appropriate delay.  <u>Id.</u> (quoting <u>Barker</u>, 407

U.S. at 531).  The reason for delay, and whether the delay is valid, is a central issue in this case.

Aleman claims that the Government either purposefully delayed the search for him or purposefully engaged in a half-hearted effort to find Aleman because it was content to arrest him if he ever was encountered.  The Court disagrees.  There is no evidence of purposeful delay.  The Government engaged in reasonable, deliberate efforts to find Aleman who intentionally absconded in 2005 to avoid criminal liability.  There also is no evidence, direct or circumstantial, that the Government acted in bad faith to delay or undertook a half-hearted effort to find Aleman.  Considering that Aleman evaded Florida authorities by absconding, and in doing so, left his wife and children behind, is compelling evidence that he intended not to be found.  He succeeded in doing so from 2008 to 2015.

The Government's response to put into place a data detection net was reasonable and a valid calculated means of using law enforcement across the country to aid in apprehending Aleman.  It undertook other investigative efforts, including following up on leads, to find Aleman.

> A government's inability to arrest or try a defendant because of the defendant's evasive tactics constitutes a valid reason for delay . . . .  But the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith.

Villarreal, 613 F.3d at 1351.  The purpose of the Barker criteria is to evaluate the relative responsibility for the delay and how the responsibility of each party relates to the time to get a defendant to trial.  The evaluation here begins in 2005 when the principal cause of the delay arose.

The facts as determined by the Court show that Aleman chose in 2005, to avoid judicial processes to determine whether he was guilty of criminal conduct in Florida.  In May 2005, he was charged in state court in Florida with drug offenses.  He was arrested.  His wife posted bail and he was released.  He was scheduled after his release to attend his arraignment.

Immediately after he bonded out of jail, he met with his wife and children for two hours and, after doing so, then left permanently.  For eight years he did not see his wife or children, and law enforcement were told by those Aleman knew or to whom he was related that they did not know where he was.  Detective Nicholson, involved in Aleman's drug trafficking prosecution in Florida, searched for Aleman from June 2005 to March 2008.  This evidence alone supports that Aleman elected to abandon his family, including his children, to avoid apprehension for the Florida action.  He was able to practice his fugitive status for three years before he was indicted in this federal drug trafficking prosecution.  Law enforcement continued to look for Aleman.

16

Detective Nicholson heard from a confidential source that Aleman was in Atlanta and involved in drug trafficking with his uncle, Juan Aleman.  Detective Nicholson arranged for his confidential source to meet with DEA investigators in Atlanta and a federal drug trafficking investigation was opened.  Federal agents had information, including surveillance photographs they concluded were of Aleman in Atlanta with Juan Aleman.  Based on the investigation conducted, Aleman and others, including Defendant Alanis-Soto, were indicted.  The DEA began an immediate search to arrest Aleman on the Arrest Warrant. The DEA was unsuccessful in locating him so the search was turned over to the USMS.  Aleman could not be apprehended because he continued his efforts to avoid law enforcement after he was arrested in 2005.

While the USMS engaged its search for Aleman, DEA Special Agent Bagley continued his investigative efforts to locate Aleman.  One method of seeking to locate a fugitive is to ensure law enforcement databases are utilized so that a fugitive will be identified if encountered by law enforcement anywhere in the country.  Agent Bagley diligently each year ensured that information about the Arrest Warrant was resident and active in the NCIC system and the El Paso Intelligence Center database.  These efforts engaged law enforcement across the

country in the search for Aleman.  These ongoing efforts were in addition to the electronic searches Agent Bagley conducted in 2008.

The USMS continued its investigation and search for Aleman.  A search of information at one point disclosed a possible address for Aleman in Smyrna, Georgia.  Inspector Navarro of the USMS investigated this location, including by initially conducting surveillance and later by seeking to interview individuals at the address he thought was associated with Aleman.  A person purporting to be Aleman's brother told investigating law enforcement personnel that Aleman had returned to Mexico.  Inspector Navarro gave the brother his contact information in case he remembered anything further.  The brother never got back in touch.

Inspector Navarro then got a lead that Aleman's former wife, Aviles, may be living in Wauchula, Florida.  A person at this Florida address, who said she was Aviles' sister, stated that Aviles may be in Austin, Texas.  The sister also told Inspector Navarro that Aleman was from Guerrero, Mexico.  Inspector Navarro could not find any further information about Aviles' location but he conducted internet searches each year looking for information about her.

Investigating agents knew Aleman grew up in Guerrero, a particularly dangerous area in Mexico.  The record, however, is that investigations in Mexico confront operational limitations because records and databases cannot be accessed,

arrests cannot be made by United States law enforcement personnel, and Mexican law enforcement will not make arrests for United States law enforcement.  The ability to investigate in Mexico, thus, is limited.  It is particularly hard to operate in Guerrero because of violence in that area.  It is DEA's practice to wait until fugitives have departed Guerrero before trying to stop them.

The records show that the USMS in 2009, nonetheless, tried to put into place initiatives that would help find and arrest Aleman if he was in Mexico.  Inspector Navarro sent a report to the DEA field office in Mexico City representing that Aleman may be in Guerrero.  He also sought Department of Justice help to issue a Red Notice to inform INTERPOL that Aleman was wanted.

Still, the search also continued in the United States.  In April 2013, law enforcement received information that Aviles had applied for a new Florida driver's license.  This allowed USMS deputies to find Aviles in Florida where she told them that Aleman had sent her a text message just that morning, asking if the children were doing well.  It is hard to believe this text message from Aleman happened coincidentally.[5]

In June 2013, the Department of Justice began working on a provisional warrant to arrest Aleman in Mexico.  The robust requirements of the warrant

---

[5]    The most reasonable inference here is that Aviles too was helping Aleman evade capture by law enforcement.

ultimately were met and the warrant was sent to Mexican officials on December 14, 2014.  Aleman was arrested on the provisional warrant in August 2015.

The Court rejects Aleman's argument that law enforcement failed to diligently seek to find and execute on Aleman the Arrest Warrant.  The efforts undertaken to find Aleman were reasonable and undertaken in good faith.  The search for Aleman was not intentionally or unintentionally delayed by the Government.  It is reasonable that a more robust search was not conducted in Guerrero considering the area's reputation of violence.

The Court finds that Aleman, knowing that he was subject to arrest and prosecution in Florida, traveled to Georgia to avoid prosecution in Florida and continued to avoid apprehension after 2005.  The Court further finds that the circumstantial evidence is that Aleman's close relatives knew federal law enforcement officials were searching for him.[6]  The reasonable inference is that these relatives communicated to Aleman that he was at least under federal investigation and, for this additional reason, he remained a fugitive, including by returning to Mexico where he took advantage of the relationships he had in Guerrero and the danger that discouraged active investigations in the area where he

---

[6]     When Aleman's brother was interviewed by Inspector Navarro in Smyrna, Georgia, he stated that Aleman knew he was wanted.

lived.[7]  When a defendant, as here, knowingly flees from the United States and the Government otherwise is diligent in trying to find and capture him using databases and other search methods, there is no speedy trial violation.  See Villarreal, 613 F.3d at 1353.

Finally, there is no evidence that any government agent intimidated or harassed Aviles or any other person during the search for Aleman.[8]

The Court, upon de novo review, having considered Aleman's objections based on diligence (Objection No. 1), omitted facts (Objection No. 3), evidence that Aleman was in Mexico (Objection No. 4), and intimidation (Objection No. 6), overrules the objections.

For the reasons stated above, Aleman's decision to avoid detection and prosecution beginning in 2005 is the principal and valid reason for the delay in the apprehension of Aleman and prosecution of this case, and this factor weighs heavily in favor of the Government.

---

[7]     Aleman argues that it was not reasonable for the Government not to conduct a search for Aleman in Guerrero and arrest him there.  Considering that Mexico is a sovereign government through which the United States must conduct its investigation activity, Aleman's argument ignores the substantial protocols that must be followed to conduct investigations in Mexico with minimal Mexican resources and capacity to cooperate.

[8]     There is no credible argument that the Magistrate Judge omitted any material facts in her R&R.  The argument that there was some misidentification of Aleman in a photograph is unsupported conjecture.  Objection No. 3 is overruled.

C.   <u>Assertion of the Right to Speedy Trial</u>

Assuming that Aleman was unaware he had been indicted in this federal action, and, thus, did not assert his right to a speedy trial, the fact he was unaware of his indictment was the result of his decision to become a fugitive in the state case.[9] The factor weighs against Aleman.

D.   <u>Prejudice</u>

Even if the validity of the delay is not dispositive of Aleman's Sixth Amendment claim, because the first of the <u>Barker</u> factors at least weigh against the Government, he is required to show he suffered actual prejudice.  He is unable to do so.  Aleman makes only generalized arguments that he has suffered prejudice because witness memories likely have faded and he was unable to depose Dr. Carbajal who declined, for medical reasons, to travel to Mexico City to be deposed.  Aleman has not provided any basis to establish or suggest actual prejudice.  A witness always may suffer an illness that interferes with his testimony—that is not a function of delay.  Aleman also does not point to a failed

---

[9]    The circumstantial evidence substantially supports that Aleman knew soon after he was indicated that federal law enforcement was looking for him and this fact was communicated to Aleman's close family members, and his co-defendants were prosecuted and sentenced for their part in the drug trafficking conspiracy in which it is alleged that Aleman was a part.  The reasonable inference is that he knew about the prosecution soon after the indictment was returned and elected to remain a fugitive.

memory by any of the witnesses he did depose in Mexico City and then suggests those witnesses will be helpful at trial.  Aleman does not show actual prejudice.

Finally, Aleman's arguments in his objections based on the credibility of witnesses, including Defendant Alanis-Soto, are arguments required to be addressed at trial.  There is no evidence before the Court to support that the witnesses—law enforcement and others—did not offer credible testimony in their testimony on the Motion to Dismiss or are not otherwise believable.  The Court in reaching its finding relies principally on the credibility and activities of the law enforcement officials who sought to find Aleman after the indictment was returned.  The Court finds their testimony credible and their conduct and their investigation efforts reasonable.  Upon de novo review, the Court overrules Aleman's Objection Nos.  2 and 5 and concludes that Aleman's Sixth Amendment speedy trial rights were not violated.

## V.    CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Magistrate Judge Catherine M. Salinas' Report and Recommendation [284] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant Blas Aleman's Objections to the R&R [288] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant Blas Aleman's Motion to Dismiss Due to Post-Indictment, Pre-Arrest Delay [214] is **DENIED**.

**SO ORDERED** this 2nd day of March, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE